AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America <br> v. <br> T. JONATHAN TURNER, <br> a/k/a Jon Barri Brothers <br><br> *Defendant(s)* | ) ) ) ) ) ) ) Case No. 19-8173-DLB |

FILED BY ___SP___ D.C.

APR 22 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __November 2016 to February 2019__ in the county of __Palm Beach__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1343 | Wire Fraud |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Jason Darling, S/A FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __04/22/2019__

_____
Judge's signature

City and state: __West Palm Beach, Florida__   U.S. Magistrate Judge DAVE LEE BRANNON
*Printed name and title*

# **AFFIDAVIT**

I, Special Agent Jason Darling, being duly sworn, do herby and depose and state:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Miami Division, Palm Beach County Resident Agency. I have been employed with the FBI since August 2010. Prior to becoming a Special Agent, I was a Border Patrol Agent with the United States Border Patrol for approximately seven years. I am presently assigned to investigate a wide variety of financial crimes, including schemes to defraud private investors through market manipulation and securities fraud. I have received training from the FBI on matters related to financial crimes and have attended multiple conferences concerning money laundering, particularly as it pertains to illicit international money movement.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Titles 18 and 21 of the United States Code. I am also a "federal law enforcement officer" as defined by Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.

3. I submit this affidavit in support of a criminal complaint charging that from as early as November 2016 to February 21, 2019, in Palm Beach County, in the Southern District of Florida, T. JONATHAN TURNER, a/k/a JON BARRI BROTHERS (hereinafter TURNER) did knowingly commit wire fraud in violation of Title 18, United States Code, Section 1343.

4. I am familiar with the facts and circumstances of the investigation set forth below through my personal participation, from discussions with other agents of the FBI, from my discussions with witnesses involved in the investigation, and from my review of records and

1

reports relating to the investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and does not set forth all my knowledge about this matter.

5. Within promotional materials and public records for CASTLEBERRY FINANCIAL SERVICES GROUP (CFG), TURNER is listed as the Vice Chairman, President, and Chief Operations Officer of the company. TURNER served in that capacity since April 4, 2016. In 1995, TURNER legally changed his name from JON BARRI BROTHERS to T. JONATHAN TURNER (State of Florida case number 131995DR020481000004). In 1995, TURNER was convicted of 25 felony counts pertaining to fraud crimes. In 1999, TURNER's probation was violated and TURNER was incarcerated from 1999 until 2016. He is presently under parole supervision until 2021.

6. Statements taken from multiple witnesses have indicated TURNER presents himself to hold a Juris Doctorate and/or Masters of Business Administration degree. On February 20, 2019, the FBI conducted a search warrant of CFG and seized a framed Juris Doctorate Degree from William Howard Taft University and a framed Masters of Business Administration degree from Emory University from TURNER'S office. In February of 2019, the Securities and Exchange Commission (SEC) referred written denials from Emory University and William Howard Taft University of TURNER having received degrees from their institutions. A review of the Florida Bar website revealed TURNER to have no license registered with the State of Florida to practice law.

7. On January 14, 2019, your affiant reviewed CFG's website (www.castleberryinvestmentgroup.com) and reviewed CFG's mission statement. Within the online mission statement for CFG, the company claimed, "We have…applied this investment philosophy over our 5-year history, deploying over $800M in capital across the balance sheets of

2

leading local businesses, and seeking to create principal-protected equity-like fixed income returns for our investors throughout economic cycles." CFG's website claims association with several insurance companies, among them were CNA Surety and Chubb.

8. On February 4, 2019, your affiant visited Sunbiz.org and queried CASTLEBERRY FINANCIAL SERVICES GROUP. Sunbiz provided current business registration for CASTLEBERRY FINANCIAL SERVICES GROUP, LLC (EIN 812423371) and a business registration date of April 26, 2016. TURNER is listed as a registered officer. However, CASTLEBERRY HOLDINGS, INC (EIN 464351315) became a registered company on December 12, 2013. CASTLEBERRY HOLDINGS, INC lists NORMAN STRELL("STRELL"), TURNER, and SUZANNE STRELL("SUZANNE") as officers. A review of CASTLEBERRY HOLDINGS, INC amendments filed with the State of Florida confirm CASTLEBERRY HOLDINGS, INC corporation filings were amended to add TURNER on November 2, 2016.

9. Castleberry promoted itself to investors as "a leading Alternative Investment Manager" with a five-year history of "deploying almost $800 million in capital across the balance sheets of leading local businesses." In offering materials intended to lure prospective investors into investing, Castleberry purported to provide "principal-protected 'equity-like' fixed income returns" by managing seven separate "surety-bond protected funds."

10. Castleberry claimed to earn high returns from the investor funds raised by acquiring and investing in real estate and distressed businesses. Investor returns were therefore dependent upon the efforts of Castleberry, Turner, and Strell, who exercised exclusive control over how investor funds were used.

11. Castleberry offered investors guaranteed returns ranging from 7.93% to 12.23% per year, depending on the fund and the number of years invested, with an additional 0.76% if the

3

interest was paid annually. Contrary to its representation that it managed seven separate funds, Castleberry pooled investor funds in one bank account that was controlled by Defendants Turner and Strell.

12. Castleberry represented that the investment principal was fully insured and bonded and that no fees were charged. These representations were made in offering materials, such as the company's web page and the company's "Quarterly Newsletter" published in January 2018 and again in January 2019, as well as in investor solicitations. These materials represented that the guarantees were provided by "best rated companies" and explicitly mentioned CNA and Chubb. For example, the first page of the company's January 2019 Quarterly Newsletter featured these graphics:



A year in review 2018
Alternative Investment Program



Financial Guarantee Bond

13. Castleberry used an investment agreement entitled "Alternative Investment Agreement" (the "Agreement"). The Agreement was provided to potential investors and made available to investors on Castleberry's web page. The Agreement stated, in bold letters: "YOUR INVESTMENT IS FULLY INSURED AND BONDED THROUGH CNA SURETY OR ONE OF ITS AUTHORIZED AFFILIATES." Turner signed at least one Agreement on behalf of Castleberry.

4

14. In order to mislead prospective investors into believing that their investment would be safe, Castleberry promised to provide investors with a certification guaranteeing the investor's deposited funds were bonded and insured. In order to deceive investors who deposited funds with Castleberry, the company provided investors with a falsified document purporting to be a CNA issued financial guarantee bond. Turner signed at least one falsified bond on behalf of Castleberry.

### Defendants' Material Misrepresentations and Omissions

15. Defendants promoted the sale of Castleberry's securities through offering materials distributed to investors by at least one sales agent and made available to the public through Castleberry's website. These materials and solicitations falsely represented that Castleberry investor proceeds were fully bonded and insured, and would be invested in real estate and distressed businesses to generate profits from which investor returns would be paid. In fact, investor funds were neither bonded nor insured and Castleberry did not make any significant income generating investments. Instead, Turner and Strell misused and misappropriated investor funds to pay for their own personal expenses and unjustly enrich themselves.

16. Defendants also lured individuals to invest their money in Castleberry's securities offerings by falsely touting Turner's prior financial industry experience and his educational achievements, while failing to disclose his prior felony convictions for larceny and forgery.

**1. Defendants misappropriated investor funds and misrepresented their use of funds raised.**

17. The funds raised by Castleberry were not used to acquire and invest in distressed businesses and income producing real estate as represented by Castleberry's offering materials and solicitations. Instead, Defendants used investor funds to make cash withdrawals, pay personal expenses, and transfer funds to their own personal bank accounts, the accounts of entities they controlled, and family members.

18. For example, Defendants transferred investor funds from Castleberry's bank account to the following individuals and entities in these approximate amounts:

  a. $377,000 to Castleberry All Sports, a business owned by TURNER and STRELL;

  b. $238,000 to a bank account in the name of TURNER and SUZANNE; and

  c. $96,000 to the Strell Trust.

19. Defendants also used at least $427,000 for the purchase, improvement, and maintenance of a home located at 577 Squire Drive in Wellington, Florida, which TURNER and SUZANNE listed as their residence.

### 2. Defendants Misrepresented Castleberry's Profitability.

20. Castleberry's publicly available promotional materials claimed that the company had "almost $800 million in capital invested across the balance sheets of leading local businesses" and "over 1100 individual investors across the country." A Castleberry sales agent made the same claims in a January 2019 interview published in a Palm Beach County magazine. In its January 2019 Quarterly Newsletter, Castleberry claimed to have a portfolio of real estate properties and that the rental income, after property taxes and maintenance, gave it "gross income of $2,819,355 per year." Contrary to Defendants' claims, Castleberry had no discernable investments in the revenue generating operations touted and generated almost no rental or business income during the more than twelve months Castleberry raised money through its securities offering.

### 2. Defendants falsely represented that their investment funds were bonded and insured by leading insurance companies.

21. In investor solicitations, investment agreements, publically available "newsletters" and corporate website materials, Castleberry touted its Alternative Investment Funds as "insured," "principal-protected" and "surety-bond protected" through leading insurance companies such as

6

CNA and Chubb. Moreover, Castleberry's Alternative Investment Agreement stated that CNA guaranteed investors' principal. These representations were false.

22. CNA and Chubb had no business relationship with Castleberry, never issued any "financial guarantee bonds" or insurance protection for its investments, and never authorized Castleberry to use their companies' names, logos, or descriptions of corporate services in any sales materials.

### 4. Defendants materially misrepresented Turner's financial services industry experience and educational achievements and omitted Turner's material criminal history.

23. In Castleberry's website, Turner was credited with being responsible for operations, leading business and corporate development, wealth management, and directing strategic growth initiatives. The website touted Turner's qualifications and experience as a "serial entrepreneur with over 27 years of experience in both the legal and financial professions" whose qualifications include a "Masters of Business Administration in Finance from Emory University as well as a Juris Doctorate-Magna Cum Laude from William Howard Taft University."

24. In truth, Turner does not have a degree of any kind from either Emory University or William Howard Taft University, and does not have 27 years of legal and financial services industry experience. Moreover, despite touting Turner's purported educational degrees, work experience, and supposed leadership and visionary qualities, Castleberry's website made no mention of the material fact that Turner is a convicted felon who was imprisoned from 1998 to 2016, rendering its statements about Turner's background and expertise materially misleading.

25. On January 14, 2019, your affiant reviewed the January 2019 issue of Wellington the Magazine. Within the magazine, CFG employee SCOTT STROCHAK("STROCHAK") is featured in a two page article wherein he is quoted saying "Jon and Norman (TURNER and

7

STRELL) were interested in doing something very creative and innovative, and I was interested in pursuing that" when referring to the type of business model put forth by CFG to investors. Later, the article quoted STROCHAK as saying, "We (CFG) are a fixed-income alternative strategy that provides Alpha return with the principle protected." STROCHAK later is quoted as saying, "We fill a void that up to this point, I think, hasn't been filled, providing a higher income approach with principal protection and insurance with one, three, and five year liquidity." STROCHAK is quoted as saying that investors will receive "twin layers of insurance" to protect their investment. Within the article, CFG is described as "Over its five-year history, the firm has deployed more than 800 million in capital, while seeking to create principle-protected fixed-income returns for its (CFG) investors." The article attributed CFG's client list as "more than 860". In January 2019, your affiant obtained financial records from Sun Trust Bank for CFG spanning from October 2017 to October 2018. CFG operating account XXXXXXXXX6323 was opened on October 17, 2017 and the authorized signatories on the account are TURNER, STRELL, and SUZANNE. Further analysis of CFG's operational account XXXXXXXXX6323 confirmed CFG received deposits of approximately 2.8 million dollars from 12 suspected victim investors.

26.   On March 5, 2019, your affiant conducted a telephonic interview with P. M., J. R., and K. R. M.P. is the treasurer for USSPRINKLER, a sprinkler installation and service company based in the State of Georgia and owned by J. R., and K. R. M.P. was also a financial adviser J. R., and K. R.. In the interview, M.P. stated that CFG employee STROCHAK solicited a $200,000.00 dollar investment from J. R., and K. R. which would provide a fixed rate return. Should J. R., and K. R. act in a set amount of time to invest their $200,000 dollars, J. R., and K. R. would receive an additional .76 percent "booster" to their fixed interest rate return.

27. STROCHAK described CFG to M.P. as a "vulture capitalist" investment firm which would buy and improve existing business to generate profit. In addition to the fixed rate of return, STROCHAK promised M.P. that J. R., and K. R.'S investment would be insured against financial loss. STROCHAK told M.P. the insuring agent for their investment would be CNA. M.P. told your affiant that aside from the fixed rate of return, the claim to insure investors against financial loss was the deciding factor to advise J. R., and K. R.'S to invest their funds with CFG.

29. In March of 2018, J. R., and K. R.'S wire transferred $200,000.00 from their bank account in Georgia to a CFG business account (6323). After J. R., and K. R. wire transferred their funds to CFG, M.P. asked STROCHAK for the insurance bond from CNA for their investment principle. STROCHAK informed M.P. that it would be a "couple of days" before a bond would be sent to J.R. and K.R. A month passed and no bond was sent to J. R., and K. R. As of the date of interview, no insurance bond has been provided to J. R., and K. R. from CFG.

30. Your affiant reviewed financial records for CFG bank account(6323), belonging to SunTrust Bank, which revealed an incoming wire transfer of $200,000.00 dollars from USSPRINKLER, INC. referencing J.R. and K. R on March 28, 2018. On March 28, 2018, $170,000.00 dollars wired from CFG account(6323) to Joseph R. Motta with a reference memo of 577 Squire. 577 Squire Dr., Wellington, FL 33414 has been identified as the primary residence for TURNER, STRELL, and SUZANNE. This investigation has determined the $170,000.00 dollar wire transfer was used to purchase the 577 Squire residence.

31. On January 15, 2019, your affiant was contacted, via email, by Legal Counsel for CNA Insurance (CNA). CNA informed your affiant that the company had reviewed its internal records and found no evidence that CNA had issued any insurance policy to CFG. Moreover, CNA had reviewed CFG's website, discussed above, and viewed the section of the website which

9

referred to "CNA Surety Bonds". As a result, CNA informed your affiant that the insurance company planned to serve a cease and desist letter to CFG in the future regarding the claim made on CFG's website of issuing CNA backed "surety bonds" to investors. On January 28, 2019, your affiant was contacted, via email, by legal counsel for Chubb Insurance. Chubb notified your affiant that Chubb provided no insurance policies to CFG.

32.     On April 18, 2019, your affiant interviewed STRELL. STRELL described TURNER as possessing a calm demeanor which could turn into anger very quickly. STRELL believes TURNER is capable of violence against him. STRELL'S depiction of TURNER'S temper is consistent with several statements made by other employees of CFG during interviews your affiant has conducted. Several other witnesses have described TURNER has having a short temper where he will suddenly change from a calm demeanor to yelling and screaming in someone's face.

33.     Based on the information provided within this affidavit, your affiant submits that there is probable cause to believe that beginning as early as November 2016 through February 21, 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, T. JONATHAN TURNER(aka JON BARRI BROTHERS) did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property from J.R. and K.R. by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and in order to execute the scheme to defraud, did knowingly transmit and cause to be transmitted, by means

or wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

_____
Jason Darling
Special Agent
Federal Bureau of Investigation

Sworn to me this 22 day of April 2019 at West Palm Beach, Florida.

_____
DAVE LEE BRANNON
UNITED STATES MAGISTRATE JUDGE

11

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

Case No: _____

**Defendant's Name: T. JONATHAN TURNER, a/k/a Jon Barri Brothers**

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|---|---|---|---|
| 1 | Wire Fraud | 18:1343 | 30 years<br>SR: 5 years<br>$1,000,000 fine<br>$100 special assessment |